IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) | Crim. No. 10-00567 HG |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) ) | |
| | ) | |
| BRANDON C. HALEAMAU, | ) ) | |
| | ) | |
| Defendant. | ) ) | |
| | ) | |

**AMENDED ORDER REGARDING THE FORFEITURE OF DEFENDANT BRANDON C. HALEAMAU'S INTEREST IN: 1) $354,421.70 SEIZED FROM HAWAII STATE FEDERAL CREDIT UNION ACCOUNT; 2) ONE SILVER 2009 ACURA TSX 4-DOOR SEDAN; 3)ONE GREY 2009 NISSAN GT-R 2-DOOR SEDAN; AND 4) ONE GREY 2008 LEXUS IS F 4-DOOR SEDAN**

Defendant Brandon C. Haleamau pled guilty to five counts of illegally importing Class B 1.3G fireworks, fraudulently mislabeling a shipping container, and structuring cash deposits to avoid currency reporting requirements.  The Government seeks the forfeiture of property alleged to constitute the direct or indirect proceeds of the Defendant's illegal conduct or property that was involved in and traceable to the Defendant's structuring.  The Defendant contests the forfeiture and argues that forfeiture of the subject property would violate the Eighth Amendment's Excessive Fines Clause.

1

The Government has proved by a preponderance of the evidence that the property in question was involved in or traceable to the Defendant's structuring offenses.  The property in question, therefore, is subject to forfeiture.  The Government, however, failed to prove that a portion of the funds seized from the Defendant's account were the direct or indirect proceeds of the sale of illegal Class B 1.3G fireworks.  The property sized by the Government, however, is nonetheless subject to forfeiture based on the Defendant's structuring offense.

Forfeiture here does not violate the Eighth Amendment's Excessive Fines Clause because the amount forfeited is not grossly disproportional to the gravity of the Defendant's offenses.

## PROCEDURAL HISTORY

On August 25, 2010, the Grand Jury returned a five count indictment against the Defendant (Doc. 1).

On March 2, 2011, the Defendant plead guilty to all counts of the Indictment.  (Minutes of Hearing, March 3, 2011 (Doc. 21).)

On May 19, 2011, the Government filed "UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF FORFEITURE FOR: 1) $345,421.70 SEIZED FROM HALEAMAU'S HAWAII STATE FEDERAL CREDIT UNION, 2) ONE SILVER 2009 ACURA TSX 4-DOOR SEDAN, 3) ONE GREY 2009 NISSAN GT-R

2-DOOR COUPE, AND 4) ONE GREY 2008 LEXUS IS F 4-DOOR SEDAN" (Doc. 28).

On June 6, 2011, the Defendant filed a "MEMORANDUM IN OPPOSITION TO UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF FORFEITURE" (Doc. 32).

On June 14, 2011, the Government filed the "UNITED STATES' REPLY TO DEFENDANT'S MEMORANDUM IN OPPOSITION" (Doc. 38).

On June 15, 2011 and June 16, 2011, a hearing on the forfeiture allegations was held.

On July 14, 2011, the Government filed the "UNITED STATES' CLOSING ARGUMENT IN SUPPORT OF ENTRY OF FORFEITURE FOR: 1) $345,421.70 SEIZED FROM HALEAMAU'S HAWAII STATE FEDERAL CREDIT UNION, 2) ONE SILVER 2009 ACURA TSX 4-DOOR SEDAN, 3) ONE GREY 2009 NISSAN GT-R 2-DOOR COUPE, AND 4) ONE GREY 2008 LEXUS IS F 4-DOOR SEDAN" (Doc. 49).

On August 11, 2011, the Defendant filed "DEFENDANT'S CLOSING MEMORANDUM IN OPPOSITION TO FORFEITURE" (Doc. 52).

On August 25, 2011, the Government filed the "UNITED STATES' REPLY TO DEFENDANT'S CLOSING MEMORANDUM IN OPPOSITION TO FORFEITURE" (Doc. 60).

## BACKGROUND

In December 2008, U.S. Immigration and Customs Enforcement discovered a container from China of Class B 1.3G fireworks

mislabeled as Class C 1.4G fireworks.  The container belonged to Defendant Brandon C. Haleamau (hereafter "Defendant").  An investigation of the Defendant revealed evidence that the Defendant had previously imported Class B 1.3G fireworks without a license, intentionally mislabeled the December 2008 shipment of fireworks, and had been evading the reporting requirements of the Bank Secrecy Act of 1970 by structuring cash deposits.

On January 25, 2010, the Government obtained a warrant to seize $345,421.70 from the Defendant's Hawaii State Federal Credit Union Account No. XX842-1 account, a silver 2009 Acura TSX 4-door sedan bearing vehicle identification number JH4CU26619C016789 and Hawaii License Plate Number PYP 034 (hereafter "Acura"), and a grey 2009 Nissan GT-R 2-door coupe bearing vehicle identification number JN1AR54M19M220020 and Hawaii License Plate Number PWP 795 (hereafter "Nissan").  The Government's investigation of the Defendant identified the seized property as being directly or indirectly traceable to proceeds of the Defendant's illegal conduct.  The Government executed the warrant on January 28, 2010.

In August 2010, the Government's investigation revealed that an additional vehicle was subject to seizure.  On August 25, 2010, the Government obtained a warrant to seize a grey 2008 Lexus IS F 4-door sedan bearing vehicle identification number JTHBP262985003310 and Hawaii License Plate Number PWY 719

pursuant to a second warrant (hereafter "Lexus").  On the same day, an indictment was returned against the Defendant containing five counts:

Count 1:   Illegally transporting approximately 50 cases of Class B 1.3G fireworks on or about July 30, 2007 through on or about September 25, 2007 in violation of 18 U.S.C. § 842(a)(3)(A).

Count 2:   Illegally transporting approximately 25 cases of Class B 1.3G fireworks on or about July 30, 2007 through on or about October 15, 2007 in violation of 18 U.S.C. § 842(a)(3)(A).

Count 3:   Illegally transporting approximately 203 cases of Class B 1.3G fireworks on or about July 30, 2007 through on or about November 14, 2007 in violation of 18 U.S.C. § 842(a)(3)(A).

Count 4:   In December 2008 intentionally mislabeling a shipment of Class B 1.3G fireworks as Class C 1.4G fireworks for the purposes of importing goods by means of a fraudulent declaration in violation of 18 U.S.C. § 542.

Count 5:   Intentionally evading the reporting requirements of 31 U.S.C. § 5313(a) by deliberately structuring $1,110,809.00 in cash deposits between June 10, 2008 and December 28, 2009 in violation of 31

U.S.C. § 5324(a)(3) and 31 C.F.R. § 103.11.

On August 26, 2010, the Government seized the Lexus pursuant to a warrant.

In the Indictment, the Government requested forfeiture of the $345,421.70, the Acura, the Nissan, and the Lexus (hereafter "Seized Property").

On March 2, 2011, the Defendant plead guilty to all counts of the Indictment.  The Defendant contests the forfeiture of the Seized Property.

On June 15, 2011 and June 16, 2011, a hearing on the forfeiture allegations was conducted.

## STANDARD OF REVIEW

Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853 govern criminal forfeiture proceedings.  See Fed. R. Crim. P. 32.2; 31 U.S.C. § 5317(c)(1)(B); 18 U.S.C. § 982(b)(1).  Pursuant to Rule 32.2(b), following a finding of guilt, the Court must "determine what property is subject to forfeiture under the applicable statute."  Fed. R. Crim. P. 32.2(b)(1)(A).

A forfeiture proceeding is part of sentencing.  See e.g., United States v. Lazarenko, 469 F.3d 815, 820 (9th Cir. 2006); United States v. Garcia-Guizar, 160 F.3d 511, 518 (9th Cir. 1998).  The preponderance of the evidence standard, therefore, applies to the proceedings.  Fed. R. Civ. P. 32.2.(b)(1)(A); see

Fed. R. Crim. P. 32.2 advisory committee's note; <u>United States v.</u> <u>Howard</u>, 894 F.2d 1085, 1090 (9th Cir. 1990) (preponderance of evidence standard used in sentencing).  In addition, hearsay is admissible in a forfeiture proceeding as long as "the testimony [is] accompanied by some minimal indicia of reliability."  <u>United</u> <u>States v. Littlesun</u>, 444 F.3d 1196, 1199 (9th Cir. 2006) (quotations omitted) (quoting <u>United States v. Berry</u>, 258 F.3d 971, 976 (9th Cir. 2001)).


## ANALYSIS

The purpose of the forfeiture law is to ensure that the defendant does not profit from his criminal conduct.  <u>See</u> <u>United</u> <u>States v. Monsanto</u>, 491 U.S. 600, 607 (1989); <u>United States v.</u> <u>Johnston</u>, 199 F.3d 1015, 1023 (9th Cir. 1999).  When the defendant contests the forfeiture, as here, the Court must conduct a hearing and receive evidence.  Fed. R. Civ. P. 32.2.(b)(1)(B).  The Court must determine, by a preponderance of the evidence, if the Government has established a nexus between the forfeited property and the offense.  Fed. R. Civ. P. 32.2.(b)(1)(A); <u>see</u> Fed. R. Crim. P. 32.2 advisory committee's note; <u>Howard</u>, 894 F.2d at 1090.

Pursuant to Rule 32.2 and 21 U.S.C. § 853 the Court must first enter a preliminary order of forfeiture.  Fed. R. Crim. P. 32.2(b)(2). Unless it is impractical, the preliminary order must

be entered "sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant." Fed. R. Crim. P. 32.2(b)(2)(B). The preliminary order becomes final as to the defendant at sentencing. Fed. R. Crim. P. 32.2(b)(3).

The Defendant pled guilty to violations of 18 U.S.C. § 842(a)(3)(A)– causing to be transported and receiving explosive materials without a licence (Counts 1, 2, and 3), 18 U.S.C. § 542 – entry of goods by means of false statement (Count 4), and 31 U.S.C. § 5324(a)(3) – structuring transactions to evade reporting requirements (Count 5). The Government moves to forfeit the Seized Property pursuant to the Defendant's guilty plea.

I.   **GOVERNMENT PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT THE SEIZED PROPERTY WAS INVOLVED IN AND TRACEABLE TO THE DEFENDANT'S ILLEGAL STRUCTURING OF FUNDS (COUNT 5)**

In sentencing the Defendant for his structuring offenses, the Court must "order the defendant to forfeit all property, real or personal, involved in the offense and any property traceable thereto." 31 U.S.C. § 5317(c)(1)(A).

A.   **The 282 Structured Cash Deposits**

Pursuant to the Bank Secrecy Act of 1970 (hereafter, "BSA"), 31 U.S.C. § 5311 *et seq.*, any time an individual makes a cash deposit in excess of $10,000, they are required to file a Currency Transaction Report (hereafter "CTR"). Structuring funds

involves making smaller cash deposits over time in an effort to avoid filing a CTR as required by the BSA. There is no dispute that the Defendant knowingly structured cash deposits as alleged in Count 5 of the Indictment. During the Defendant's plea, he admitted to structuring funds for the purpose of avoiding federal reporting requirements. (Government's Exhibit 11 at p.15 ln.22-24.)

Special Agent Craig Wyly of the Internal Revenue Service, Criminal Investigation Unit, testified about his investigation into the Defendant's illegal structuring of funds. S.A. Wyly has special training and experience in conducting money-laundering and structuring investigations. S.A. Wyly testified that he examined every deposit made into the Defendant's various bank accounts. (June 15 Transcripts at p.84 ln.22 - p.85 ln.2.) S.A. Wyly identified cash deposits made on the same day, consecutive days, or within a few days of each other that would have exceeded $10,000 and would have required the filing of a CTR. (Id. at p.87 ln.21 - p.88 ln.14.) S.A. Wyly testified that typically structured deposits are repetitive and are made in rounded amounts between $2,000 and $5,000. (Id.) The cash deposits made into the Defendant's accounts reflect repetitive and rounded cash deposits. S.A. Wyly testified that between June 10, 2008 and December 28, 2009, the Defendant made 282 cash deposits totaling

$1,105,644.[1] (Id. at p.82 ln.12-16.) S.A. Wyly testified that the Defendant specifically admitted during several interviews that he was structuring his deposits to avoid filing a CTR. (Id. at p.93 ln.9-13, p.94 ln. 20 - p.p5. Ln.3.) At the forfeiture hearing, the Defendant offered no evidence to call into question any of the 282 cash deposits made into his bank accounts.

The Court finds that the Government proved by a preponderance of the evidence that the Defendant structured 282 cash deposits between June 10, 2008 and December 28, 2009, totaling $1,105,644.

### B.    Tracing the Structured Cash Deposits

Pursuant to 31 U.S.C. § 5317(c)(1)(A), only those funds that are "involved in the offense and any property traceable thereto" are subject to forfeiture. S.A. Wyly conducted an initial analysis of the Defendant's structuring activities and concluded that $345,421.70 of the $399,000 in the Defendant's Hawaii State Federal Credit Union bank account, on the date of seizure, were traceable to structured funds and were, therefore, subject to forfeiture. On January 28, 2010, the Government seized the

---

[1]Count 5 of the Indictment alleges that the Defendant structured 283 transactions totaling $1,110,809, rather than the 282 transactions totaling $1,105,644 identified by S.A. Wyly. S.A. Wyly explained on the stand that after independently verifying each cash transaction, one transaction of $5,145 was removed from his calculations because he discovered it was a deposit of a check and, therefore, would not be subject to the filing of a CTR. (June 15 Transcripts at p.86 ln.3-26.)

$345,421.70 from the Defendant's account pursuant to S.A. Wyly's calculations. The Government left $53,578,30 in the account as it could not conclusively determine that the funds were structured.[2]

The Defendant disputes the methodology S.A. Wyly used to trace the structured funds in the Defendant's account. S.A. Wyly testified that he used an accounting approach called the Lowest Intermediate Balance Rule (hereafter, "LIBR") to determine which funds in the Defendant's accounts were structured.

The LIBR is an accounting approach borrowed from the law of trusts to determine the rights of a trust beneficiary to funds in a trustee's bank account. <u>See</u> Restatement (Second) of Trusts § 202(1) comment j (1959). The LIBR has also been used in the area of secured transactions to trace proceeds in a sale that have been commingled with other funds. <u>See</u> <u>Brown & Williamson Tobacco Corp. v. First Nat'l Bank</u>, 504 F.2d 998 (7th Cir. 1974). The Second Circuit Court of Appeals first identified the LIBR as an effective method for tracing structured funds in <u>United States v. Banco Cafetero Panama</u>, 797 F.2d 1154, 1159 (2d Cir. 1986). While the Ninth Circuit Court of Appeals has never specifically

---

[2]S.A. Wyly testified that after the $345,421.70 had been seized, he conducted further analysis and concluded that an additional $8,715.35 of structured funds were subject to forfeiture. The Government, however, did not seize the additional $8,715.05 of structured funds and does not currently seek its forfeiture.

identified the LIBR as a method used to trace tainted funds, the
court has endorsed the accounting principles underlying the LIBR
in money laundering cases.  <u>See</u> <u>United States v. Hanley</u>, 190 F.3d
1017, 1024-1025 (9th Cir. 1999); <u>United States v. Rutgard</u>, 116
F.3d 1270, 1293 (9th Cir. 1997); <u>see also</u> <u>United States v.
Laykin</u>, 886 F.2d 1534, 1541 (9th Cir. 1989) (endorsing accounting
approaches identified in <u>Banco Cafetero</u>); <u>United States v.
Weisberg</u>, 08-CR-347 (NGG)(RML, 2011 U.S. Dist. LEXIS 104222, at
*14-16 (E.D.N.Y. Sept. 14, 2011) (characterizing Ninth Circuit's
approach to tracing tainted funds commingled with legitimate
funds as the LIBR).  In addition, district courts in the Ninth
Circuit have used the LIBR as an effective accounting method for
tracing structured funds.  <u>See</u> <u>United States v. Yaqman</u>, 502 F.
Supp. 2d 1084, 1087-88 (C.D. Cal. 2007); <u>United States v.
3,148,884.40 United States Currency</u>, 76 F. Supp. 2d 1063,
1066-1067 (C.D. Cal. 1999); <u>United States v. Funds Representing
Proceeds of Drug Trafficking in the Amount of $75,868.62
Transferred to Account No. 7916944712</u>, 52 F. Supp. 2d 1160, 1164
(C.D. Cal. 1999)

The LIBR is an accounting principal used to calculate which
funds are subject to forfeiture in an account containing both
tainted and legitimate funds.  <u>See</u>, <u>Banco Cafetero</u>, 797 F.2d at
1159.  The LIBR posits that when commingled funds are in an
account, legitimate funds are withdrawn first, leaving the

tainted funds in the account. When there is insufficient legitimate funds to cover a specific withdraw, then tainted funds are used to cover the withdraw. The balance of tainted funds in the account is reduced according to the amount needed to make the withdraw. This reduced balance of tainted funds is considered the intermediate balance of the tainted funds. If legitimate funds are added to the account later, the intermediate balance of tainted funds in the account does not increase. Over the course of time, as deposits and withdraws are made into an account, the LIBR keeps track of the intermediate balance of tainted funds in the account. For example, if an account contains $1,000 of tainted funds and $1,000 of legitimate funds totaling $2,000, then so long as at least $1,000 remains the account at the time of seizure, $1,000 will be considered tainted and, therefore, subject to forfeiture. If however, at some point the balance of funds in the account drops below $1,000, for example to $800, and there is no evidence that additional tainted funds were added to the account, the lowest intermediate balance of tainted funds would be at most $800. Regardless of how much money was in the account at the time of seizure, the LIBR would only allow forfeiture of $800 because that would be the lowest intermediate balance of tainted funds in the account.

S.A. Wyly testified that he used the LIBR to calculate that $345,421.70 of the Defendant's account was directly traceable to

his structuring offenses.  The Defendant disputes the use of the LIBR.  The Defendant argues that 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p) invalidates the use of the LIBR.

Pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p) (hereafter "Substitute Asset Provision"), when structured funds that are subject to forfeiture have been "commingled with other property which cannot be divided without difficulty" the "court shall order the forfeiture of any other property of the defendant, up to the value" of the property subject to forfeiture.  21 U.S.C. § 853(p); see United States v. Casey, 444 F.3d 1071, 1074 n.3 (9th Cir. 2006).  The Substitute Asset Provision is triggered when the funds subject to forfeiture cannot be separated from the legitimate funds.  The legislative history of 21 U.S.C. § 853(p) indicates that the Substitute Asset Provision was designed to thwart attempts by money-launderers to exploit a loop-hole in the LIBR.  H.R. Rep. No. 102-28, at 54 (1991).  Specifically, money-launderers would completely empty their accounts containing commingled funds rendering the intermediate balance of tainted funds zero.  Id. at 54-56. Zeroing-out a commingled account would make tracing funds impossible using the LIBR.  Id.; see, e.g., United States v. All Funds Presently on Deposit at Am. Express Bank, 832 F. Supp. 542, 559 (E.D.N.Y. 1993).  The Substitute Asset Provision avoids this difficulty by allowing for the forfeiture of any of the

Defendant's assets if his conduct has made tracing otherwise
impossible:

> There is no reason why fungible property, such as the
> balance in a bank account, should escape forfeiture
> simply because the property is capable of being moved
> in and out of the government's view with great
> rapidity.  If despite the apparent disbursement of the
> property it remains capable of being replaced or
> reconstituted in identical form at any time because of
> its fungible nature, it should remain subject to
> forfeiture.  Any other rule merely rewards those who
> contrive sophisticated shell games to hide the
> whereabouts of criminally derived property.

H.R. Rep. No. 102-28, at 55 (1991); see, e.g., United States v.
Chavez, 323 F.3d 1216, 1218 (9th Cir. 2003) (forfeiting lottery
winnings as substitute for funds that were the proceeds of
methamphetamine business); accord United States v. Voight, 89
F.3d 1050 (3d Cir. 1996).

In this case, however, it is not necessary to use the
Substitute Asset Provision.  While the Defendant's structured
deposits were commingled with legitimate funds, there is no
indication that the Defendant ever "zeroed-out" his account to
render the LIBR ineffective.  S.A. Wyly testified that he was
able to untangle the Defendant's structured deposits from the
other "legitimate" funds in the Defendant's account using the
LIBR.  S.A. Wyly's use of the LIBR to trace the amount of
structured funds in the Defendant's account was reliable and
credible.

The Government proved by a preponderance of the evidence

that the $345,421.70 seized from the Defendant's Hawaii State Federal Credit Union account was involved in and traceable to the Defendant's violations of 31 U.S.C. § 5324(a)(3).

### C.  The Seized Vehicles

On January 28, 2010, the Government seized a grey 2009 Nissan GT-R 2-door coupe and a silver 2009 Acura TSX 4-door sedan pursuant to a warrant issued on January 25, 2010.  On August 26, 2010, the Government seized a grey 2008 Lexus IS F 4-door sedan pursuant to a warrant issued on August 25, 2010.  The Government seeks the forfeiture of these three automobiles (hereafter "Seized Vehicles") pursuant to 31 U.S.C. § 5317(c)(1)(A).  For the Seized Vehicles to be subject to forfeiture, the Government must prove by a preponderance of the evidence that the money used to purchase the seized vehicles is traceable to the Defendant's structuring offenses.  31 U.S.C. § 5317(c)(1)(A); see, e.g., United States v. Mudd, 1:06-CR-00057-R, 2009 U.S. Dist. LEXIS 5574, at *5-6 (W.D. Ky. Jan. 23, 2009).

In S.A. Wyly's Affidavit, entered into evidence as Exhibit 1, S.A. Wyly details how the money deposited into six of the Defendant's accounts were used in the purchasing of the seized vehicles.  (Government's Exhibit 1, Affidavit of Craig Wyly dated January 4, 2010 at ¶¶ 41-46.)

Defendant purchased a silver 2009 Acura TSX 4-door sedan on December 28, 2008 from Pfluger Acura.  (Id. at ¶ 42.)  The

Defendant used a $30,500 check drawn from Hawaii State Federal Credit Union (hereafter "FCU") Account XX842-1 that contained tainted funds.  (Id.)  S.A. Wyly calculated that of the $30,500 drawn from the account, $6,088 was traceable to illegally structured deposits.  (Government's Exhibit 1, Affidavit of Craig Wyly dated August 24, 2010 at ¶ 15(c).)

On December 8, 2008, the Defendants purchased a gray 2009 Nissan GT-R 2-door coupe for $84,847.84 from Hawaii Nissan, Inc. (Government's Exhibit 1, Affidavit of Craig Wyly dated January 4, 2010 at  at ¶ 43.)  Defendant used a $30,000 check drawn from his Hawaii State FCU Account XX842-1 to make the down payment on the vehicle and secured a loan for the remaining cost.  (Id.)  The Government has not offered any evidence that the $30,000 used as a down payment was traceable to the Defendant's illegal structuring of deposits.  S.A. Wyly's analysis, however, indicates that on August 13, 2008, November 3, 2008, and November 15, 2008, the Defendant made payments to Bulletproof Automotive to purchase special parts for the Nissan totaling $41,864.77. (See Government's Exhibit 7-R.)  These payments were drawn from the Defendant's Hawaii State FCU Account XXXX60-77.  (Id.)  S.A. Wyly, using the LIBR, concluded that $39,864.77 of the $41,864.77 was traceable to the Defendant's structured deposits.  (Id.)

On October 23, 2008, Defendant purchased a grey 2008 Lexus IS F 4-door sedan for $50,000 using $23,000 cash, two $1,000

travelers checks, and a check for $25,000 drawn from the Defendant's Bank of Hawaii Account XXXXXXX7094. (Government's Exhibit 1, Affidavit of Craig Wyly dated August 24, 2010 at ¶¶ 21-25.) S.A. Wyly testified that he traced the funds used to satisfy the $25,000 check and determined that $24,337.11 of funds were traced to structured deposits. (<u>Id.</u> at ¶24.)

The Defendant offered no evidence to refute S.A. Wyly's calculations regarding the Seized Vehicles. S.A. Wyly's analysis is credible and is based on a comprehensive analysis of the Defendant's financial activity.

A preponderance of the evidence proves that:

1.  $6,088.00 of structured funds were used to purchase Defendant's silver 2009 Acura TSX 4-door sedan;

2.  $39,864.77 of structured funds were used to purchase parts for Defendant's grey 2009 Nissan GT-R 2-door coupe; and

3.  $24,337.11 of structured funds were used to purchase Defendant's grey 2008 Lexus IS F 4-door sedan.

**D.   Conclusion**

Pursuant to 31 U.S.C. § 5317(c)(1)(A) and 21 U.S.C. § 853, the Defendant's interest in the following property is **FORFEITED** because the following property was involved in and traceable to the Defendant's violations of 31 U.S.C. § 5324(a)(3):

1.   $345,421.70 from Brandon C. Haleamau's Hawaii State
     Federal Credit Union Account No. XX842-1 seized on
     January 28, 2010;

2.   A silver 2009 Acura TSX 4-door sedan bearing vehicle
     identification number JH4CU26619C016789 and Hawaii
     License Plate Number PYP 034, seized on January 28,
     2010;

2.   A grey 2009 Nissan GT-R 2-door coupe bearing vehicle
     identification number JN1AR54M19M220020 and Hawaii
     License Plate Number PWP 795, seized on January 28,
     2010; and

3.   A grey 2008 Lexus IS F 4-door sedan bearing vehicle
     identification number JTHBP262985003310 and Hawaii
     License Plate Number PWY 719, seized on August 26,
     2010.

## II.  GOVERNMENT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE SEIZED PROPERTY CONSTITUTED, OR WAS DERIVED FROM, THE PROCEEDS OF THE DEFENDANT'S ILLEGAL CONDUCT IN COUNTS 1, 2, AND 3

In sentencing the Defendant as to Counts 1, 2, and 3, the
Court must "order that the person forfeit to the United States
any property constituting, or derived from, proceeds the person
obtained directly or indirectly, as the result" of the offenses.
18 U.S.C. § 982(a)(2).

Defendant pled guilty to illegally transporting 1.3G type

fireworks without a licence pursuant to 18 U.S.C. § 842(a)(3)(A)
(Counts 1, 2, and 3).  Count 1 involved the illegal
transportation of approximately 50 cases of Class B 1.3G
fireworks on or about July 30, 2007 through on or about September
25, 2007.  Count 2 involved the illegal transportation of
approximately 25 cases of Class B 1.3G fireworks from July 30,
2007 through October 15, 2007.  Count 3 involves the
transportation of approximately 203 cases of Class B 1.3G
fireworks between July 30, 2007 and November 14, 2007.

To obtain a forfeiture of the Seized Property pursuant to
Counts 1, 2, and 3, the Government must prove by a preponderance
of the evidence that the Seized Property was the direct or
indirect proceeds of the Defendant's illegal transportation of
the Class B 1.3G fireworks.  <u>See</u> Fed. R. Civ. P. 32.2.(b)(1)(A);
<u>see</u> Fed. R. Crim. P. 32.2 advisory committee's note; <u>Howard</u>, 894
F.2d at 1090.  The Government argues that the Seized Property was
the proceeds of the Defendant selling the Class B 1.3G fireworks
he illegally imported pursuant to Counts 1-3.

**A.   Illegal Sale of Class B 1.3G Fireworks**

The Government offered the following evidence to prove the
Defendant was engaged in the illegal sale of Class B 1.3G
fireworks.

*(1)  Testimony of Special Agent Gary Graham*

Special Agent Gary Graham of the Bureau of Alcohol, Tobacco,

Firearms & Explosives testified about two interviews he conducted with the Defendant. (Government Excerpts of Record Supplementing the United States' Closing Argument (hereafter "ER"), filed July 14, 2011 (Doc. 50), Transcripts of June 15, 2011 Proceedings (hereafter "June 15 Transcripts") at pp. 44-47.) The first interview was on December 30, 2008 in the Customs Office. (<u>Id.</u> at p.44 ln.22 – p.45 ln.6.) During the December 30, 2008 interview Defendant admitted selling Class B 1.3G fireworks to pay for the shipment of fireworks seized by law enforcement in December 2008. (<u>Id.</u> at p.45 ln.20-23.) The second interview was on January 28, 2009 in the garage of the Defendant's residence. (<u>Id.</u> at p.47 ln.1-23.) At the second interview, Defendant told S.A. Graham that he had planned to sell the fireworks seized in December 2008 "on the street" for a profit. (<u>Id.</u> at p.48 ln.9-12.) S.A. Graham testified that the Defendant admitted selling fireworks to a client named Jenny Jones (hereafter "J. Jones"). (<u>Id.</u> at p.48 ln.13-18.)

S.A. Graham further testified about two individuals who purchased illegal fireworks from the Defendant. The first individual S.A. Graham spoke with was J. Jones. (<u>Id.</u> at p.50 ln.4-6.) During S.A. Graham's testimony, the Government entered Exhibit 19 into evidence. (<u>Id.</u> at p.53 ln.7.) Exhibit 19, titled "Summary of Event: Interview of Jennie Jones," details an interview conducted by S.A. Graham with J. Jones on April 20,

2010. (<u>Id.</u> p.51, ln. 6-11; Government's Exhibit 19 at 00005714.)
According to Exhibit 19, J. Jones told S.A. Graham that she had
paid the Defendant $36,307 in checks and approximately $7,000 in
cash for the purchase of Class B 1.3G and Class C 1.4G fireworks.
(<u>Id.</u>) At the hearing, however, J. Jones testified she was unsure
if any of the fireworks she purchased from the Defendant were
Class B 1.3G fireworks. (<u>Id.</u> at p.14 ln.21-22.) J. Jones
identified nine cancelled checks she used to purchase fireworks
from the Defendant between June 2008 and October 2008. (<u>Id.</u> at
p.6 ln.16 - p.11 ln.25; Governments Exhibits 20A-I.) When cross-
examined about what she did with the fireworks she purchased from
the Defendant, J. Jones invoked her Fifth Amendment right against
self-incrimination. (<u>Id.</u>)

The second individual S.A. Graham spoke with was Chad
Paredes (hereafter "C. Paredes"). S.A. Graham testified that C.
Paredes was friends with the Defendant and had previously
purchased fireworks from him. (<u>Id.</u> at p.54 ln.7-14.) S.A.
Graham identified a fireworks price list that was prepared by the
Defendant and given to C. Paredes. (<u>Id.</u>; Government's Exhibits
21 and 21a). The price list included illegal Class B 1.3G type
fireworks. (<u>Id.</u>) Agent stated that he compared the prices that
were listed on the Defendant's price list with the prices charged
for the same fireworks at a licenced fireworks distributor. (<u>Id.</u>
at p.58 ln.17-25). According to S.A. Graham, Defendant was

22

offering Class B 1.3G fireworks at prices substantially higher than the wholesale price. (Id. at p.59 ln.1-18.)

At no time did the Defendant offer any evidence to refute or contradict S.A. Graham's testimony regarding the two interviews with the Defendant or his interactions with J. Jones and C. Paredes. S.A. Graham's testimony was credible and was supported by documentary evidence.

*(2) Testimony of Special Agent Jason Pa*

The second witness called by the Government was Jason Pa, a Special Agent for the Department of Homeland Security Immigration and Customs Enforcement. (Id. at p.24 ln.22 - p.44 ln.10.) S.A. Pa testified that he, along with Special Agent Derrick Lee and S.A. Steve Marceleno of the Department of Homeland Security Immigration and Customs Enforcement, interviewed the Defendant at the St. Louis School Clubhouse on January 2, 2009. (Id. at p.29 ln.11 - p.30 ln.1.) During the interview, the Defendant stated he purchased the shipment of Class B 1.3G fireworks seized by the Immigrations and Customs Enforcement in December 2008 (Count 4) with proceeds from previous sales of illegal fireworks and illegal gambling. (Id. p.27, ln.10-14.) S.A. Pa testified that the Defendant admitted he made numerous cash deposits into his and his wife's bank accounts from these proceeds. (Id. at p.28 ln.13-17.) When S.A. Pa asked the Defendant what he intended to do with the shipment of Class B 1.3G fireworks seized in December

2004, the Defendant stated that he intended to sell the illegal fireworks "on the street" for a profit. (<u>Id.</u> at p.27, ln.20-21.)

The Defendant's cross examination of S.A. Pa did not reveal any inconsistencies or raise any concern as to the credibility of his testimony. S.A. Pa's testimony was credible and was supported by documentary evidence.

*(3) Testimony of Special Agent Craig Wyly*

S.A. Wyly testified that between June 10, 2008 and December 28, 2009 the Defendant made $1,105,664 in 282 separate cash deposits into six bank accounts. (<u>Id.</u> at p.82, ln.11-15.) S.A. Wyly further stated in an affidavit admitted as Exhibit 1, that illegal fireworks sales are predominantly conducted on "cash only" bases. (Government's Exhibit 1, Affidavit of Craig Wyly dated January 4, 2010 at ¶ 23.) Mr. Wyly stated that illegal cash proceeds from fireworks sales are frequently structured into smaller cash deposits to prevent law enforcement from uncovering illegal activity. (<u>Id.</u>) The pattern of the Defendant's cash deposits reflect this practice.

S.A. Wyly further testified that he interviewed the Defendant on January 28, 2010, the same day the Defendant's $345,421.70 was seized from his bank account. During that interview, the Defendant told S.A. Wyly that he had approximately $400,000 in his bank account. (<u>Id.</u> at p.109 ln.1-25.) S.A. Wyly

testified that the Defendant told him that of the $400,000, between $250,000 - $150,000 were proceeds of the Defendant's illegal gambling, $75,000 was from "legit jobs," and part of the $400,000 represented proceeds from illegal fireworks sales. (Id.)

### (4) Interview with Shelly Obata

The parties stipulated to the admission of Exhibit 15, which is titled "Memorandum of Interview" and was prepared by S.A. Wyly on March 26, 2010. (Id. p.24 ln.2.; Government's Exhibit 15) Exhibit 15 details the substance of an interview with Shelly Obata (hereafter, "S. Obata"). (Id. at p.23 ln.8-12.) The Defendant stipulated during the hearing that if S. Obata were to testify, she would do so consistent with contents of Exhibit 15. (Id. at p.23 ln.8-25.) According to Exhibit 15, S.A. Wyly and S.A. Graham were present. (Government's Exhibit 15.) During the interview, S. Obata stated that the Defendant was always "bragging about how he was selling illegal fireworks." (Id. at ¶ 5.) S. Obata told agents that the Defendant took her and C. Parades to Waikele Self Storage where the Defendant was storing his fireworks. (Id. at ¶ 3.) S. Obata stated that the Defendant gave her and C. Parades a fireworks price list of those fireworks the Defendant was selling. (Id. at ¶ 6.) According to S. Obata the fireworks were expensive. (Id.) S. Obata stated that the Defendant did not ask S. Obata to distribute the price list, but

said if S. Obata or C. Parades knew of anyone looking to buy
fireworks they should send them to the Defendant. (Id. at ¶ 7.)

   *(5)  Interview with Mereck Pang*

   Exhibit 16, which is titled "Memorandum of Interview," and
was prepared by S.A. Craig Wyly on April 6, 2010. (June 15
Transcripts at p.24 ln.2.; Government's Exhibit 16.)  Exhibit 16
details the substance of an interview with Mereck Pang
(hereafter, "M. Pang"). (Id. at p.23 ln.8-12.)  The Defendant
stipulated during the hearing that Exhibit 16 could be used in
lieu of M. Pang's testimony. (Id. at p.23 ln.8-25.)  According
to M. Pang, the Defendant was attempting to purchase a home and
told M. Pang that he had $250,000 or more to make a down payment.
(Government's Exhibit 16 at ¶ 6.)  According to M. Pang, the
Defendant claimed that he earned the $250,000 from "from his
fireworks business." (Id.)   The Defendant did not, however,
specify whether this money was from the sale of legal or illegal
fireworks sales. (Id.)  Accordingly, the Court cannot rely on M.
Pang's interview to prove that the Defendant was selling illegal
Class B 1.3G fireworks.

   *(6)  Conclusion Regarding the Defendant's Illegal Sale of
        Class B 1.3G Fireworks*

   In light of the testimony of S.A. Graham, S.A. Pa, S.A. Wyly
and the documentary evidence of S. Obata's interview, the
Government has proven by a preponderance of the evidence that the
Defendant was engaged in the illegal sale of Class B 1.3G

fireworks.

**B. Tracing Funds to Defendant's Illegal Fireworks Sales**

In the Indictment, the Government alleges that $345,421.70 seized from the Defendant's bank account on January 28, 2010 constituted the proceeds of the Defendant's illegal transportation and sale of Class B 1.3G fireworks. In the Government's Closing Argument, however, the Government concedes that the Defendant's sale of Class B 1.3G fireworks "yielded net proceeds of up to $265,650.00 that were then deposited in Defendant's Hawaii State FCU account XX842-1." (Government's Closing Argument, filed on July 14, 2011, at 17 (Doc. 49).)

The Government points out that in 2007 and 2008, the Defendant's actual income and cash deposits far exceeded his reported income of $9,447 in 2007, and a loss of $13,020 in 2008. During that same period the Defendant was selling illegal Class B 1.3G fireworks. The Government argues that because the Defendant was engaged in illegal fireworks sales during a period when he reported to the I.R.S. he was not making any significant income, any money he earned in 2007 and 2008 were the proceeds of those illegal fireworks sales.

The Government derives the $265,650.00 figure by multiplying the wholesale value of the Class B 1.3G fireworks imported by the Defendant pursuant to Counts 1, 2, and 3 ($26,565) by a factor of ten. S.A. Graham testified that the Class B 1.3G fireworks sold

illegally on the street sell for approximately ten-times their wholesale price.  (June 15 Transcripts at p.59 ln.19-25.)

The Government must prove by a preponderance of the evidence that the seized funds were the proceeds of the Defendant's illegal fireworks sales in order for the Court to forfeit the Seized Property pursuant to 18 U.S.C. § 982(a)(2).  <u>United States v. Garcia-Guizar</u>, 160 F.3d 511, 518 (9th Cir. 1998) (Criminal forfeiture "limited to that portion of [Defendant]'s property that the government proved by a preponderance of the evidence was the proceeds obtained as a result of the activities for which he was convicted.").  The Government has not met its burden.

The Defendant illegally imported Class B 1.3G fireworks and began selling those illegal fireworks "on the street" in July 2007.  There is no evidence, however, indicating how much money the defendant received for those illegal fireworks sales.  The only evidence in the record concerning deposits made by the Defendant begin in June 2008.  Between July 2007 and June 2008, there is no evidence tracing the Defendant's illegal fireworks sales to any specific income.  Without this important link, the Government cannot carry its burden of proving that the seized funds from the Defendant's bank account are traceable to illegal fireworks sales.

In addition, the $265,650.00 figure calculated by the Government is speculative.  <u>See</u> <u>United States v. Corrado</u>, 227

F.3d 543, 557 (6th Cir. 2000). The $265,650.00 figure assumes that the Defendant sold 100 percent of the fireworks he illegally imported at ten-times the wholesale price. The Government has only submitted the testimony of S.A. Graham who states that customers routinely pay ten-times above the wholesale price. There is no evidence that the Defendant sold a substantial portion of his illegal inventory of Class B 1.3G fireworks. In fact, there is evidence in the record that a portion of the Defendant's Class B 1.3G fireworks were stolen, given away, and personally used by the Defendant. (See Government's Exhibit 15 at ¶¶ 9-13.) The Court cannot assume that the Defendant sold every illegally imported Class B 1.3G firework at time-times the wholesale price.

Having examined the evidence in the record, it is clear that the Defendant was engaged in illegal fireworks sales. The evidence does not establish by a preponderance of the evidence, however, that $265,550.00 of the $345,421.70 sized from the Defendant's bank account are the proceeds of the Defendant's illegal fireworks sales. The Government has not met its burden of tracing the seized funds to the Defendant's illegal fireworks sales.

C.    The Seized Vehicles

The Government has not put forward any evidence to prove that the seized vehicles were purchased with proceeds from the

Defendant's illegal fireworks sales. The Government, therefore, has not met its burden to prove that the Seized Vehicles were purchased with proceeds of illegal fireworks sales.

### D.    Conclusion

The evidence put forward by the Government proves by a preponderance of the evidence that the Defendant engaged in illegal fireworks sales.

The Government has not put forward sufficient evidence to prove that is more likely than not that $265,550 of the Defendant's funds seized on January 28, 2010 were the direct or indirect proceeds of selling Class B 1.3G fireworks in 2007 and 2008. The evidence does not prove by a preponderance of the evidence that $265,550 of the $345,421.70 were the proceeds of the Defendant's illegal fireworks sales.

The Government has not established by a preponderance of the evidence that the Seized Vehicles where purchased with the proceeds from the Defendant's illegal fireworks sales.

The Seized Property, however, is still subject to forfeiture as the Seized Property is traceable to the Defendant's structuring offenses (Count V).

### III. FORFEITURE OF THE SEIZED PROPERTY DOES NOT VIOLATE THE EIGHTH AMENDMENT PROHIBITION AGAINST EXCESSIVE FINES

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual

punishments inflicted." U.S. Const. amend. VIII. Criminal

forfeitures are considered "fines" within the meaning of the

Eighth Amendment because they "constitute punishment for an

offense." United States v. Bajakajian, 524 U.S. 321, 328 (1998).

In Bajakajian, the Supreme Court held that "[t]he touchstone

of the constitutional inquiry under the Excessive Fines Clause is

the principle of proportionality:  The amount of the forfeiture

must bear some relationship to the gravity of the offense that it

is designed to punish." Id. at 334.  Pursuant to Bajakajian, a

criminal forfeiture "violates the Excessive Fines Clause" when

the forfeiture "is grossly disproportional to the gravity of a

defendant's offense." Id.

In Bajakajian, Bajakajian attempted to leave the United

States without reporting, as required by federal law, that he was

transporting more than $10,000 in currency. Id. at 324.  A

search by customs revealed that Bajakajian and his wife were

carrying $357,144 in cash. Id. at 325.  Bajakajian plead guilty

to willfully failing to report a currency transaction in

violation of 31 U.S.C. §§ 5316, 5322(a). Id. at 325-26.

Pursuant to the statute, the $357,144 in currency was subject to

a mandatory criminal forfeiture. Id.  The United States Supreme

Court held that the forfeiture of $357,144 in currency was

grossly disproportionate to the gravity of Bajakajian's offense.

Id. at 339.  The Court reasoned that because Bajakajian's offense

was a single reporting violation unrelated to other illegal conduct, the penalty for the violation was up to six months in prison and a $5,000 fine, and there was relatively little harm caused by the offense, the $357,144 forfeiture violated the Eighth Amendment. Id. at 337–39.

## A.    The Four Bajakajian Factors

In applying the principles outlined in Bajakajian, the Ninth Circuit Court of Appeals considers four factors to determine whether a forfeiture is grossly disproportionate to the gravity of an offense: "(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused." United States v. $100,348.00 in United States Currency, 354 F.3d 1110, 1122 (9th Cir. 2004).

The forfeiture of the Seized Property in this case is based on the Defendant's structuring violations. The Defendant challenges the forfeiture of the Seized Property pursuant to the Eighth Amendment's Excessive Fines Clause. The Defendant argues that the forfeiture of $345,421.70 and three motor vehicles is a punishment that is grossly disproportional to offenses pled to in the Indictment.

*(1)  Nature and Extent of the Defendant's Crime*

The nature and extent of the Defendant's structuring

offenses warrant forfeiture of the seized property.  Unlike the
defendant in Bajakajian who committed a single currency reporting
violation, the Defendant engaged in a sophisticated scheme to
avoid filing Currency Transaction Reports (hereafter "CTRs").
Over the course of eighteen months, the Defendant structured 282
cash deposits to deliberately avoid filing CTRs.  See, e.g.,
United States v. Ahmad, 213 F.3d 805, 816 (4th Cir. 2000)
(holding that numerous structuring transactions were "readily
distinguishable" and more serious than the single failure to
report).  In total, the Defendant structured $1,105,644.00 in
cash deposits.  Defendant's structuring offense is "far more
serious than Bajakajian's" single reporting offense.  United
States v. Castello, 611 F.3d 116, 121 (2d Cir. N.Y. 2010)

     The Defendant admitted during his guilty plea that his
intention in structuring the funds was so he "did not have to pay
extra taxes on the money [he] had." (Government's Exhibit 11 at
p.15 ln.22-24.)  The Defendant's motive in structuring is readily
distinguishable from Bajakajian, in which the defendant tried to
take his own money out of the country in violation of the
reporting requirements out of "fear stemming from 'cultural
differences[.]'"  524 U.S. at 326, 337 n.12.  In Bajakajian, the
Supreme Court specifically identified the motive of tax evasion
in determining the gravity of the defendant's offense.  Id. at
333.  Here, the Defendant deliberately structured his

transactions to avoid paying taxes.  See, e.g., United States v. Fifty-Nine Thousand Dollars ($ 59,000.00) in United States Currency, 06-60573-CIV-COHN, 2009 U.S. Dist. LEXIS 122333, at *10-11 (S.D. Fla. Dec. 10, 2009) (considering the motive of tax evasion in a Bajakajian analysis).  This first factor weighs in favor of full forfeiture.

*(2)  Relation to Other Illegal Activities*

The Defendant admitted on several occasions that he was structuring cash earned from illegal gambling proceeds and illegal fireworks sales.  While the Government has not specifically traced which funds were the proceeds of the Defendant's illegal fireworks sales, the evidence proves that prior to and during the Defendant's structuring offenses, he was engaged in illegal fireworks sales and illegal gambling.  Unlike the defendant in Bajakajian who had a single reporting transaction unrelated to illegal activity, the Defendant's structuring is intimately associated with illegal conduct.  See, e.g., Ahmad, 213 F.3d at 816-817 ("The structured transactions thus bore an intimate connection to the customs fraud.").  This second factor weighs in favor of full forfeiture.

*(3)  Other Potential Penalties*

In quantifying the gravity of an offense for Eighth Amendment purposes, courts look to the maximum statutory fines authorized by Congress and the maximum fines available pursuant

34

to the applicable sentencing guidelines. <u>Bajakajian</u>, 524 U.S. at 338-39 n.14; <u>United States v. 3814 NW Thurman Street, Portland, OR</u>, 164 F.2d 1191, 1197 (9th Cir. 1999). Typically, when the value of the forfeited property is less than the maximum statutory fine, it suggests that the forfeiture is not grossly disproportionate to the gravity of the offense. <u>Bajakajian</u>, 524 U.S. at 338-39; <u>see United States v. 817 N.E. 29th Drive, Wilton Manors, FL</u>, 175 F.3d 1304, 1309 (11th Cir. 1999). Several courts, however, have held that forfeitures in excess of the statutory and guideline maximum do not render a forfeiture excessive. <u>See, e.g.</u>, <u>Ahmad</u>, 213 F.3d at 816-17 (forfeiture of $85,000 million even though statutory maximum fine was $5,000); <u>Castello</u>, 611 F.3d at 123 (forfeiture of $12 million even though statutory maximum fine was $250,000). "<u>Bajakajian</u> does not mandate the consideration of any rigid set of factors in deciding whether a punitive fine is grossly disproportional to the gravity of a defendant's offense." <u>United States v. Mackby</u>, 339 F.3d 1013, 1016 (9th Cir. 2003) (quotations omitted).

The maximum statutory fine for the Defendant's illegal structuring (Count 5) is $250,000. Because the forfeiture is premised on the Count 5 only, the maximum statutory fines of $250,000 for each of Counts 1, 2, 3, and 4 are not included in this analysis. <u>See Bajakajian</u>, 524 U.S. at 339 n.12. Pursuant to the grouping requirements set forth in U.S. Sentencing

Guideline Manual § 3D1.2, the guideline's fine range for all
Counts is between $10,000 – $100,000.

While the forfeiture of the Seized property exceeds the
statutory maximum of $250,000, it is not excessive in this case
for two reasons. First, the Defendant knowingly structured
$1,105,644.00 in cash deposits in a deliberate attempt to avoid
paying taxes. In Ahmad, the Fourth Circuit Court of Appeals
affirmed the forfeiture of $85,000 when the maximum statutory
fines was $5,000. 213 F.3d at 817-818. The Ahmad Court viewed
the defendant's deliberate and numerous currency violations and
his willful attempt to commit fraud as dispositive factors. Id.
The Ahmad Court held that a forfeiture that was seventeen times
the statutory maximum was not in violation of the Eighth
Amendment. Id.

Second, there is substantial evidence indicating that the
Defendant was engaged in the illegal sale of fireworks. Although
the Government could not definitively trace the amount of money
the Defendant made from his illegal fireworks, the evidence
clearly indicates that the Defendant was in the business of
selling dangerous fireworks "on the street" for a profit. This
is not the case, as in Bajakajian, where the only crime the
defendant was guilty of was structuring.

The value of the Seized Property, $345,421.70 and three
motor vehicles, is approximately 1.5 times greater than the

statutory maximum fine of $250,000 for the structuring offense.
Considering the Defendant's conduct and his deliberate attempt to
avoid paying taxes on $1,105,644.00, forfeiting the Seized
Property is not excessive.  See, e.g., United States v. Six
Negotiable Checks in Various Denominations Totaling $191,671.69,
389 F. Supp. 2d 813, 826 (E.D. Mich. 2005) ("While the amount of
the forfeiture here is perhaps somewhat greater than the
penalties that would have been imposed under the pertinent tax
statutes and Sentencing Guidelines, it is not so much larger that
the forfeiture can be said to be grossly disproportional.").
This third factor weighs in favor of full forfeiture.

*(4)  The Extent of the Harm Caused*

The CTR statute "exists so that the government can track the
flow of cash transactions" and ensure "these large amounts of
cash are not funneled into criminal activities."  Castello, 611
F.3d at 123-124; see 31 U.S.C. § 3511. In Bajakajian, the Supreme
Court reasoned that the defendant's conduct "affected only one
party, the Government, and in a relatively minor way.  There was
no fraud on the United States, and [the defendant] caused no loss
to the public fisc."  524 U.S. at 339.  The same cannot be said
about the Defendant's conduct.

The Defendant's failure to file CTRs resulted in a loss of
information to the Government used to track and monitor criminal
activities.  See 31 U.S.C. § 3511; Bajakajian, 524 U.S. at 339.

Moreover, the Defendant's deliberate structuring of $1,105,644.00 in cash deposits "did not violate a lone reporting duty imposed on him as an individual.  Rather, his structured deposits were for a commercial purpose and caused" several financial institutions "to fail on numerous occasions to comply with its reporting obligations." <u>Ahmad</u>, 213 F.3d at 816; <u>see, e.g.</u>, <u>United States v. An Interest in the Real Prop. Located at 2101 Lincoln Blvd.</u>, CV 05-5353 SVW (PJWx),CV 05-5354 SVW (PJWx),CV 05-5356 SVW (PJWx),CV 05-5357 SVW (PJWx), 2011 U.S. Dist. LEXIS 21402, at *21-22 (C.D. Cal. Jan. 14, 2011).

Moreover, the Defendant illegally imported Class B 1.3G fireworks into the State of Hawaii and sold them "on the street" to make a profit.  Dangerous explosives in the hands of untrained and unqualified individuals poses a substantial risk of life-threatening injury.  This fourth factor, i.e, the extent of the harm caused, weighs in favor of full forfeiture.

**B.    The Forfeiture's Proportionality**

Having considered the four factors enunciated by the Ninth Circuit Court of Appeals and the United States Supreme Court, the forfeiture of the Seized Property does not violate the Eighth Amendment's Excessive Fines Clause.  The Defendant deliberately structured $1,105,644.00 to avoid paying taxes and illegally sold dangerous Class B 1.3G fireworks "on the street" for a profit. The forfeiture of $345,421.70 and three motor vehicles is,

38

therefore, not grossly disproportionate to the gravity of the Defendant's offenses.

## CONCLUSION

(1) Pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853, the Defendant's interests in the following property is **FORFEITED** at the time of sentencing and shall be made part of the sentence and included in the judgment:

    (A) $345,421.70 from Brandon C. Haleamau's Hawaii State Federal Credit Union Account No. XX842-1 seized on January 28, 2010;

    (B) A silver 2009 Acura TSX 4-door sedan bearing vehicle identification number JH4CU26619C016789 and Hawaii License Plate Number PYP 034, seized on January 28, 2010;

    (C) A grey 2009 Nissan GT-R 2-door coupe bearing vehicle identification number JN1AR54M19M220020 and Hawaii License Plate Number PWP 795, seized on January 28, 2010; and

    (D) A grey 2008 Lexus IS F 4-door sedan bearing vehicle identification number JTHBP262985003310 and Hawaii License Plate Number PWY 719, seized on August 26, 2010.

(2) The United States shall publish notice of this Order or

its intent to dispose of the property in such a manner as the Attorney General may direct. The United States may also, to the extent practicable, provide written notice to any person known to have an alleged interest in the subject property.

(3) Any person, other than the Defendant, asserting a legal interest in the subject property may, within thirty days of the final publication of notice or receipt of notice, petition the Court for a hearing without a jury to adjudicate the validity of his alleged interest in the subject property, and amendment of the order of forfeiture pursuant to 21 U.S.C. § 853.

(4) The United States shall have clear title to the Seized Property following the Court's disposition of all third party interests, or, if none, following the expiration of the period provided in 21 U.S.C. § 853(n).

//
//
//
//
//
//
//

(5) The Court shall retain jurisdiction to enforce this
    Order, and to amend it as necessary, pursuant to Fed.
    R. Crim. P. 32.2(e).

IT IS SO ORDERED

DATED: August 1, 2012, Honolulu, Hawaii.



/S/ Helen Gillmor
_____
Helen Gillmor
United States District Judge


United States v. Brandon C. Haleamau, Crim. No. 10-00567 HG;
**AMENDED ORDER REGARDING THE FORFEITURE OF DEFENDANT BRANDON C.
HALEAMAU'S INTEREST IN: 1) $354,421.70 SEIZED FROM HAWAII STATE
FEDERAL CREDIT UNION ACCOUNT; 2) ONE SILVER 2009 ACURA TSX 4-DOOR
SEDAN; 3)ONE GREY 2009 NISSAN GT-R 2-DOOR SEDAN; AND 4) ONE GREY
2008 LEXUS IS F 4-DOOR SEDAN.**